Anne Andrews, Esq. (SBN: 103280)
Sean T. Higgins, Esq. (SBN 266888)
Kimberly DeGonia, Esq., (SBN 256989)
Ryan M. McIntosh, Esq. (SBN: 328042)
**ANDREWS & THORNTON**
4701 Von Karman Ave., Ste 300
Newport Beach, CA, 92620
Tel.: (949) 748-1000
Fax: (949) 315-3540
survivor@andrewsthornton.com

*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE<br><br>    Plaintiff,<br><br>  v.<br><br>DOE 1 (a corporation),<br>and DOES 2-500, Inclusive,<br><br>    Defendants. | **CASE NO.: 2:25-cv-00713**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Sexual Abuse of a Minor (Against DOE 1, and DOES 2-500)**<br>2. **Negligence (Against DOE 1, and DOES 2-500)**<br>3. **Negligent Infliction of Emotional Distress (Against DOE 1, and DOES 2-500)**<br>4. **Negligent Hiring, Supervision, and Retention of an Unfit Employee (Against DOE 1, and DOES 2-500)**<br><br>**DEMAND FOR JURY TRIAL** |

1. PLAINTIFF JANE DOE, by and through her attorneys, Andrews & Thornton, Watts Law Firm, bring this action against Defendants DOE 1 (a corporation), and DOES 2-500.

2. Defendant DOE 1 ("DOE 1") is a money-making, profiteering enterprise. Make no mistake. DOE 1 is one of the richest corporations in the world, and one of its primary endeavors is to make even more money. The consequence of that commercial focus is devastating for the hundreds-- if not thousands-- of victims of childhood sexual abuse, like PLAINTIFF herein, at the hands of leaders of DOE 1 DOE 1's obsession with reputation and money over protection of

sex abuse survivors drives decisions at all levels. In order to preserve the influx of generations of tithing and other financial commitments from congregants, and to entice others to join DOE 1 to add to the number of tithing members, DOE 1 hides, covers up, and ultimately knowingly and directly benefits from the trafficking of children. This case is about one such child who was fostered with four of her siblings by a DOE 1 Bishop and his wife for the purpose of using her to satisfy Bishop's prurient and pedophilic interests. For the four years she was fostered by Bishop Nefi Rubalcava, PLAINTIFF was subjected to sexual abuse, digital penetration, groping above and beneath clothing, and was forced to regularly watch Bishop Rubalcava walk around the house erect and naked, masturbate, and urinate.

## PRELIMINARY STATEMENT

3.      Upon information and belief, DOE 1 had previously received reports that Bishop Nefi Rubalcava had abused other children. Yet, Bishop Nefi Rubalcava was allowed to remain a prominent member of DOE 1 as the Bishop of the Santa Fe Springs Spanish-Speaking ward. A ward is a local congregation of DOE 1 members. A stake is made up of multiple wards, generally between five to ten wards.

4.      Upon information and belief, DOE 1 disregarded red flags of Bishop Nefi Rubalcava's sexually abusive behavior, including how often and closely he volunteered to work closely with children. Instead, Bishops, stake presidents, home teachers, relief society members, and other leaders followed the DOE 1 playbook in turning a blind eye to signs of abuse which could mar the reputation of DOE 1.

5.      PLAINTIFF was removed from her mother and stepfather's home in 1981 when she was approximately 8 years old and was put into foster care in Norwalk, California. She had been baptized as a member of DOE 1 earlier that year and had been attending services with her mother and stepfather for her entire life. She and her siblings were removed from the home because of violent physical abuse and disturbing sexual abuse PLAINTIFF and her siblings experienced at the hands of their Stepfather, Juan Guerrero Regalado, who was a member of DOE 1.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

6.    Specifically, Juan Guerrero Regalado sexually abused PLAINTIFF by isolating her in a bedroom, kissing her, rubbing her vagina over her underwear, and holding her hand and rubbing it on his penis over his clothes.

7.    When PLAINTIFF was removed from the perpetrator Stepfather's home, PLAINTIFF and her 8 siblings were housed and cared for by Bishop Nefi Rubalcava and his wife, Elvira Rubalcava, on an emergency basis for a month. While under the complete care and control of the Rubalcava's, PLAINTIFF confided in Elvira Rubalcava about the abuse she had endured at the hands of her stepfather.

8.    Subsequently, PLAINTIFF and her 8 siblings entered the foster care system in Los Angeles County, California, and were separated for several months until Bishop Nefi Rubalcava and his wife entered the scene like white knights to reunify the children. They registered as foster parents and allowed 5 of the oldest siblings to stay with them, including PLAINTIFF, while 3 of the youngest siblings were permitted by the court to return to their mother, who moved back to Mexico after the children were removed from the home.

9.    While in foster care, PLAINTIFF disclosed to her social worker the forceful and unwanted kissing, groping, and fondling her stepfather had done to her.

10.    Upon information and belief, DOE 1 and Bishop Rubalcava became aware that PLAINTIFF was sexually abused by her stepfather. While serving as Bishop, Bishop Nefi Rubalcava made a calculated decision based upon this information to become a foster parent to PLAINTIFF, knowing the increased vulnerability of a child who had already endured such trauma. He preyed upon her and took advantage of her innocence, naiveté, and traumatic history to more easily manipulate her when she was under his care and control.

11.    Upon information and belief, DOE 1 was already aware of allegations against Bishop Rubalcava for sexual abuse, yet Bishop Nefi Rubalcava became a foster parent with the full permission and support of DOE 1.

12.    From the time PLAINTIFF was baptized into DOE 1 at 8 years old, she was threatened, harassed, intimidated, and sexually abused, masturbated, groped, kissed, fondled, forced to perform oral copulation, and raped thousands of times by a serial abuser, in Norwalk,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

California, and who DOE 1 knowingly enabled to be put in positions of power over other children and potential victims.

13.    On numerous occasions DOE 1 had knowledge—constructive or otherwise—of PLAINTIFF's abuse. Abuse by Bishop Rubalcava began on DOE 1 property at a DOE 1 activity for children and young adults called "Mutual," a weekly social evening event hosted by DOE 1 for their Young Men and Young Women's groups.

14.    At Mutual, Bishop Rubalcava pretended to stumble and playfully grab PLAINTIFF, tickled her, and leaned on her pretending to need her help to stay upright. He used this as an opportunity to grope her breasts and buttocks in the presence of other members of the DOE 1, including other leadership.

15.    PLAINTIFF felt immediate shame and discomfort at the inappropriate, violating, and unwanted groping, yet also felt guilt for feeling negatively because Bishop Rubalcava was such a revered member of the community.

16.    This happened on approximately 4-5 more occasions at DOE 1 sponsored events before it escalated further at home.

17.    PLAINTIFF arrived home from elementary school approximately 2 hours earlier than her older siblings, who attended high school at the time. When she arrived home from school, Bishop Rubalcava would be alone at the house waiting for her.

18.    Bishop Rubalcava used this time alone to more easily sexually abuse PLAINTIFF. While home, he would strategically wait for her on a couch in front of the hallway to her room and the kitchen. He would trip her to make her fall on top of him so he could grope her on top of her clothes on her buttocks, pubic area, and breasts, while pretending to help her stand back up. After doing this for several weeks, he escalated to groping her under her clothes on her buttocks and pubic area as well as above her clothes on her breasts while pretending to have trouble helping her stand up. Nearly every time she came home, he would find a way to touch her inappropriately.

19.    After approximately two months of this pattern, he escalated the abuse routine to reaching beneath her underwear, rubbing her vagina, and digitally penetrating her.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

20.    Bishop Rubalcava also frequently required PLAINTIFF to sit on the couch next to him and tried to kiss her on multiple occasions while preaching to her about DOE 1 beliefs and stories.

21.    Additionally, Bishop Rubalcava would walk around the house naked with an erection and force PLAINTIFF to watch him masturbate.

22.    Bishop Rubalcava regularly intentionally left the bathroom door open and forced PLAINTIFF to watch him urinate with an erection.

23.    Bishop Rubalcava used his prestigious position and reputation in DOE 1 to intimidate PLAINTIFF out of reporting the abuse to anyone. Bishop Rubalcava made threats to PLAINTIFF, claiming that no one would believe her if she told them, people would hate her if she told them, and caused her to fear for the continued shelter and safety of herself and the four siblings who lived with the Rubalcava family.

24.    Upon information and belief, Bishop Rubalcava disenfranchised PLAINTIFF from other members of the DOE 1 by creating rumors that PLAINTIFF was a troubled child and a "black sheep", thereby ruining her credibility in the community and further protecting himself in the event that PLAINTIFF reported the abuse.

25.    PLAINTIFF's behavior noticeably and drastically changed in response to the abuse. Before the abuse, PLAINTIFF was a gregarious, highly social child, but after the abuse began, she became shy, reserved, and played primarily by herself. Furthermore, before the abuse, PLAINTIFF was highly social with Bishop Perpetrator along with the other children who loved him, however after the abuse began, PLAINTIFF began avoiding him at all costs and remained stoic and fearful in his presence. PLAINTIFF was visibly anxious and scared in Rubalcava's presence, shirking away from his touch in public places. PLAINTIFF additionally became afraid and avoidant of all adult males, especially those associated with DOE 1. Other adults and children alike in the Ward recognized and commented on PLAINTIFF's retreat from social activities during this time.  Despite members of DOE 1 recognizing these dramatic changes in demeanor, DOE 1 failed to intervene.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

26.     PLAINTIFF regularly begged her mother and others in DOE 1, including Elvira Rubalcava, not to leave her alone at the house, but never explained why out of fear. PLAINTIFF endured this abuse for approximately four years before she ran away from home and followed her mother to a bus stop, convincing her to take her back to Mexico with her.

## JURISDICTION AND VENUE

27.     This Court properly has diversity jurisdiction to hear civil claims where complete diversity between PLAINTIFF and defendant exists and the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1332(a). DEFENDANT DOE 1 and JANE DOE are domiciled in different states and the amount in controversy is sufficient.

28.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendants are subject to personal jurisdiction in this District.

29.     State law causes of action I-IV are timely brought pursuant to California Code of Civil Procedure § 340.1, which require PLAINTIFF to bring an action for childhood sexual assault within 5 years of the date they discovered or reasonably should have discovered that their psychological injury or illness was caused by the sexual assault. Here, PLAINTIFF discovered her injuries were related to the sexual assault in December 2020, when she first saw an advertisement on social media talking about the effects of sexual abuse in church communities.

## DEFENDANT PARTIES

**I.    DOE 1**

30.     DOE 1 is a corporation duly organized and operating pursuant to the laws of the State of Utah, with its principal place of business at 50 East North Temple, Floor 20, Salt Lake City, State of Utah 84150. However, DOE 1 operates meeting houses, congregations, and temples (wards, stakes and areas) within the state of California. Indeed, this case centers around one such ward, the Santa Fe Springs Spanish Ward in Santa Fe Springs, California. This ward has since been absorbed into other wards within the Cerritos California Stake. DOE 1 is registered to do business in California. The presiding bishop of the Santa Fe Springs Spanish Ward served at the pleasure of and subject to the direct and absolute control of DOE 1 In addition, DOE 1 collects

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

tithes, accepts donations, invests money, and covers up childhood sexual abuse in the state of California. Specifically, this Court has specific personal jurisdiction over DOE 1 arising out of the facts alleged herein: the sexual abuse. As alleged herein, by retaining and obtaining additional tithes, donations and profits from congregants in California as a result of the coverup of PLAINTIFF' abuse, DOE 1 purposefully availed itself of the privilege of conducting activities within California, thus invoking the benefits and protection of its laws. This case, and PLAINTIFF'S injuries alleged herein, directly arise out of DOE 1's activities that took place in California.

31.    At all times relevant to the allegations listed herein, PLAINTIFF was a member of the Santa Fe Springs Spanish-Speaking Ward, which has since been absorbed into other wards in the Cerritos Stake. The Santa Fe Springs Spanish-Speaking Ward ("WARD") was wholly owned and operated by its parent, DOE 1, based in Salt Lake City, Utah.

32.    A significant percentage of DOE 1's income comes from member tithes, some of which are used for traditional administrative functions and charitable purposes. However, a large percentage of DOE 1's income also comes from other financial commitments above and/or separate from tithes. Unbeknownst to most congregants and the public until recently, DOE 1 uses income from both tithing and other financial contributions from congregants for strictly commercial enterprises, including financial investment vehicles like stock, real estate, and other profit-generating market endeavors. In 1997, DOE 1 created a non-profit entity called Ensign Peak Investments whose articles of incorporation specify that it is organized exclusively for religious, educational, and charitable purposes. Ensign Peak Investments benefited from tax exemptions pursuant to § 501(c)(3) of the Internal Revenue Code. Despite this, based on information and belief, Ensign collected donations and tithes for more than two decades, without ever disbursing the funds towards any charitable purpose. Upon information and belief, DOE 1 benefited from Ensign's non-profit status by receiving billions of dollars in tax breaks from the interest of investments, without doing anything charitable, religious, or educational. DOE 1 does not provide information about their finances to their members or the public. Upon information and belief, DOE 1 receives more than seven (7) billion dollars a year in tithing from members.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Upon information reported publicly in the media, DOE 1 owns financial assets and real estate in excess of 200 billion dollars.

**II.    DOE DEFENDANTS 1-500**

33.    The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 1 through 500, inclusive, are unknown to PLAINTIFF who are therefore ignorant of the true names and sue said Defendants by such fictitious names. PLAINTIFF believe and allege that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to PLAINTIFF as alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 1 through 500, inclusive, are presently unknown to PLAINTIFF, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained.

34.    At all times hereinafter alleged, "DEFENDANTS" or "All DEFENDANTS" include all herein named Defendants as well as Defendants DOES 1 through 500, inclusive.

35.    At all times herein alleged, each of the DEFENDANTS was the agent, servant, partner, aider and abettor, co-conspirator and joint venturer of each of the remaining DEFENDANTS herein and was at all times operating and acting within the course, purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other DEFENDANTS, knowing that their conduct constituted a breach of duty owed to PLAINTIFF and unlawful harm to PLAINTIFF.

## **PLAINTIFF**

36.    JANE DOE was at all times relevant to the tortious conduct herein mentioned a resident of the County of Los Angeles, State of California. JANE DOE attended the Santa Fe Springs Spanish Ward in the Cerritos California Stake at all times relevant to the tortious conduct herein mentioned. At the time of filing this complaint, Jane Doe is a resident of Las Vegas, Nevada.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

37.    This is an action for childhood sexual abuse brought pursuant to Code of Civil Procedure ("CCP") § 340.1, subdivision (a)-(d) and any other applicable statute. The true name of Defendant DOE 1 is known to PLAINTIFF, but they are named as a DOE Defendant Pursuant to Code of Civil Procedure §340.1. At the time of filing this complaint, PLAINTIFF is above the age of 40.

## FACTUAL BACKGROUND

*DOE 1 Is a Profiteering Commercial Enterprise that Covers Up and Enables Abuse to Protect Its Wealth and Reputation*

38.    The case is not about religious or doctrinal beliefs in any way. This case is about an organization that retained and protected a known predator and permitted its youth members to be repeatedly sexually abused.

39.    In 2017, a lengthy expose compiled by a child abuse health researcher was released online. The 300-page document details hundreds of instances of sex abuse within DOE 1 taken primarily from public court filings. The research is an eye-opening look into the pervasiveness of childhood sexual abuse in DOE 1 and their inadequacy in responding to it. A common theme emerges of ward bishops and leaders being given information of child sexual abuse in the ward, information which is then passed along to DOE 1 Nothing is done. No one is told. And the abuse continues.

40.    In the rare circumstance a report is made to the authorities, DOE 1 still diminishes, denies, and conceals evidence of the abuse and their knowledge of it from DOE 1 members, authorities, and the public at large.

41.    DOE 1 maintains a pattern and practice of concealing abuse from the authorities, and signals that its members should conceal and/or fail to report abuse so as to keep "DOE 1 from being inappropriately implicated in legal matters." See President Russell M. Nelson Letter (August 4, 2020). Through this policy of concealment, DOE 1 ratifies abusive conduct, perpetuating a culture of concealment and encouraging a lack of cooperation among DOE 1 members with law enforcement. This case is no different.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

42.    DOE 1 is well known for its meticulous record keeping. DOE 1 maintains an archive of records at Granite Mountain Records Vault located in the foothills surrounding the Salt Lake Valley in Utah. These records detail important circumstances surrounding individual members. Reports are created and maintained at individual wards that detail membership attendance, genealogy of members, addresses of members, reports of abuse, and reports regarding disciplinary proceedings. These records are then sent from the individual wards to the record archives that are maintained in the greater Salt Lake City area in Utah. The records and custom and practice of maintaining records require an individual record for each member. The disciplinary records are comprehensive and detailed, per the practices of DOE 1

43.    DOE 1's written policies shed light on their general priorities. According to the DOE 1's General Handbook, "The purposes of DOE 1 discipline are (1) to save the souls of transgressors, (2) to protect the innocent, and (3) to safeguard the purity, integrity, and good name of the Church. These purposes are accomplished through private counsel and caution, informal probation, formal probation, disfellowshipment, and excommunication." See pgs. 93-95.  The Stake Presidents and Bishops Handbook states as follows: "[i]n instances of abuse, the first responsibility of the Church is to assist those who have been abused, and to protect those who may be vulnerable to future abuse."

44.    More specifically, DOE 1 notes in its administrative handbook that the second purpose of Church discipline is to protect the innocent. Yet, perpetrators go undisciplined until discipline is made necessary by an external force. Disclosure of the identity of others who participated in a transgression may be required when it is necessary to restore or protect persons who have been or may be seriously injured as a result of the transgression. DOE 1's position is that abuse cannot be tolerated in any form. Abusers should not be given Church callings, which are positions of service that members are appointed to through revelation and the Spirit. Additionally, abusers may not have a temple recommend, which signifies that a member can enter the temple. Even if a person who abused a child sexually or physically receives Church discipline and is later restored to full fellowship or readmitted by baptism, leaders should not call the person to any position working with children or youth unless the First Presidency authorizes

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

removal of the annotation on the person's membership record. The First Presidency is the highest governing body in DOE 1 and consists of a prophet and two prophet counselors.

45.     DOE 1's written policies may look congruent with reasonable care on their face. However, a quicky look reveals that they are sorely lacking. Nevertheless, the policies they put into practice diverge significantly from even those written in its Handbook.

46.     DOE 1 maintains a national Helpline that purports to assist victims in reporting their sexual assaults. However, DOE 1 implements the Helpline not for the protection and counseling of sexual abuse victims, as professed in DOE 1 literature, but for Kirton McConkie attorneys to snuff out complaints and protect DOE 1 from potentially costly lawsuits and jury verdicts. This is consistent with the instructions set forth in President Russell M. Nelson Letter, dated August 4, 2020, encouraging congregants to avoid cooperating with authorities asking for information on abuse.

47.     In conjunction with the doctrine of helping victims, Utah's Supreme Court has characterized the Helpline used by DOE 1 as "a 1-800 number that bishops and other DOE 1 clergy can call when they become aware of possible abuse. The Help Line is available 24 hours a day, 365 days a year and is staffed by legal and counseling professionals who 'provide guidance to the bishop on how to protect the [victim] from further abuse, and how to deal with the complex emotional, psychological, and legal issues that must be addressed in order to protect the victim.'" MacGregor v. Walker, 2014 UT 2 ¶2,322 P.3d 706, 707 (2014) [internal citation omitted in original].

48.     In reality, DOE 1 primarily staffs the Helpline with attorneys of Kirton McConkie, one of the largest law firms in the State of Utah.  Rather than notifying law enforcement or other government authorities when Bishops and other clergy members call the Helpline regarding sexual abuse within DOE 1 Helpline operators transfer these calls to the Kirton McConkie attorneys, who advise the caller not to report the abuse incident to law enforcement, misrepresenting clergy-penitent privilege laws as their reasoning.

49.     In another sexual abuse-related civil lawsuit against the Mormon DOE 1 and its agents, a Kirton McConkie attorney "acknowledged during a pretrial deposition that the firm

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    uses information gleaned from helpline calls to identify cases that pose a high financial risk to

2    the Mormon Church" See The Mormon Church Has Been Accused of Using a Victim's Hotline

3    to Hide Claims of Sexual Abuse (https://www.vice.com/en/article/duty-to-report-the-mormon-

4    church-has-been-accused-of-using-a-victims-hotline-to-hide-sexual-abuse-claims/).

5         50.    The Sins of Brother Curtis recounts the horrific details of DOE 1's systemic

6    failure to address known predators in its leadership. Lisa Davis, The Sins of Brother Curtis

7    (2011). Brother Curtis was an elder in DOE 1, a position attained by most men after a worthiness

8    interview by the stake president -the leader of a group of local congregations. Despite spending

9    numerous years in prison for crimes he committed prior to joining DOE 1, he was deemed worthy

10   to hold the position of an elder. Countless DOE 1 leaders learned of Brother Curtis' tendencies

11   to molest children but failed to report him or inform their congregants. Brother Curtis sexually

12   abused at least twenty (20) minors over a 14-year span. Despite leaders within DOE 1 knowing

13   of Brother Curtis' proclivity for sexually abusing minors, DOE 1, as part of a national conspiracy

14   spanning decades, moved Brother Curtis from a ward in Oregon to Wyoming back to Oregon

15   then to Michigan and finally back to Oregon. At one point, Brother Curtis had been

16   excommunicated but was permitted to be rebaptized into DOE 1 where he continued to sexually

17   abuse minors.

18        51.    Upon information and belief, DOE 1 was aware that Bishop Nefi Rubalcava

19   abused other children and yet he was allowed to continue serving as WARD's bishop and was

20   praised for being PLAINTIFF's foster parent.  Upon information and belief, DOE 1 required

21   adults who knew of Bishop Rubalcava's unlawful, perverted sexual actions, to remain quiet about

22   it.

23        52.    Bishop Rubalcava was never disciplined for his sexual deviance and pedophilic

24   predatory behavior.  JANE DOE has never recovered from the abuse she experienced as a young

25   child.

26   *DOE 1 Failed to Protect PLAINTIFF and Enabled the Horrendous Abuse to Continue Beyond*

27                        *Bishop Nefi Rubalcava's First Reported Victims*

28

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

53.    Upon information and belief, Bishop Nefi Rubalcava sexually abused other children in DOE 1 and DOE 1 was aware of this.

54.    Bishop Nefi Rubalcava was an esteemed and valuable member of the DOE 1 community, holding leadership positions with youth and in the Bishopric, including as Bishop. DOE 1 proceeded to suppress the knowledge—both actual and constructive— as much as possible in order to preserve its own reputation and that of the Rubalcava family and turned a blind eye and a deaf ear to as many of the actual and constructive warnings it received throughout PLAINTIFF's abuse.

55.    Had it been made public knowledge that the beloved Bishop, Bishop Nefi Rubalcava, the patriarch of a prominent and large family well-established at the WARD, DOE 1 would have certainly lost donations, membership, and most significantly, willing members to perform the free labor on which DOE 1 sustains itself. Therefore, upon information and belief, the DOE 1 covered up and ignored the abuse. DOE 1's purported policy to "protect victims" is a farce. DOE 1 is far more interested in protecting its financial commitments and the appearance of its moral reputation. This case is the perfect example, DOE 1 could and should have prevented PLAINTIFF's abuse by stopping Bishop Rubalcava from interacting with other children, including his foster-daughter, when initial allegations were made. Furthermore, by simple virtue of the fact that DOE 1 was aware of the earlier abuse PLAINTIFF endured at the hands of her stepfather and that she was left in the care of a prominent leader of DOE 1 rather than her family should have indicated to them that PLAINTIFF was in need of greater protection. Yet, no one from DOE 1 paid any mind or attention to PLAINTIFF. This would have given PLAINTIFF greater opportunity to disclose the abuse she was experiencing.

56.    Upon information and belief, by wrongfully failing to make a report to law enforcement upon learning of Bishop Nefi Rubalcava's victims, DOE 1 prevented law enforcement from investigating sooner, which would have produced evidence of Bishop Nefi Rubalcava's calculated and perverted sexual abuse of children.

57.    Instead, DOE 1 allowed Bishop Nefi Rubalcava to continue completely unhindered and even protected his predatory conduct. DOE 1, its agents, and employees,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

including bishops, counselors, or personnel mentioned herein, DOES 1- 500, and each of them, acted to protect the heinous and unforgivable acts of its member, Bishop Nefi Rubalcava, and in such action taken against PLAINTIFF'S innocence and vulnerabilities, were careless, reckless, negligent, and consciously disregarding a minor's rights.

## PUNITIVE DAMAGES ALLEGATIONS

58.    PLAINTIFF repeats and re-alleges the allegations set forth in the above paragraphs 1-54 as though fully set forth herein.

59.    At all times herein, DEFENDANTS knew or should have known of Bishop Nefi Rubalcava's history of child sex abuse. DOE 1 acted with reckless indifference for every child in the WARD when they failed to report out, warn, or take any affirmative steps to protect children from Bishop Nefi Rubalcava. As a result of DOE 1's deliberate inaction, innumerable children were endangered by Bishop Nefi Rubalcava

60.    Upon information and belief, despite prior knowledge of Bishop Nefi Rubalcava's predatory behavior, DOE 1 maintained Bishop Nefi Rubalcava as a member in good standing with the corporation, allowing him to have access to more potential victims as a leader in DOE 1 and as a foster parent to other children. As alleged herein, each of the DEFENDANTS and its agents played a role in enabling Bishop Nefi Rubalcava to abuse PLAINTIFF. This action by DOE 1 exceeded malicious and oppressive conduct against PLAINTIFF.

61.    Such conduct is willful, wanton and reckless, justifying an award of punitive damages in an amount to be proven at trial.

## COUNT I

## SEXUAL ABUSE OF A MINOR

## (Against DOE 1 and DOES 2-500)

62.    PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

63.    While PLAINTIFF was a member of DOE 1's community and reliant upon DOE 1, Bishop Rubalcava used his position of authority in DOE 1 as the Bishop of the Santa Fe Springs Spanish Ward and as JANE DOE's foster father to silence and maintain control over JANE DOE.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

This tactic included concealing his predatory behavior by molesting JANE DOE while ostensibly providing religious instruction. Rubalcava was so bold that he also molested JANE DOE in the presence of others at the ward on multiple occasions. This supported his claims to JANE DOE that no one would believe he was harming her because of the how beloved and respected he is by the Santa Fe Springs Spanish Ward.

64. Bishop Rubalcava did this to sadistically, violently, and even incestuously sexually abuse and control JANE DOE for at least 4 years of her childhood. This included molestation, groping, fondling, masturbation, digital penetration, and other harmful misconduct with PLAINTIFF. PLAINTIFF did not consent to the acts, nor could PLAINTIFF have consented to the acts given her young age at the time of the abuse.

65. Upon information and belief, DOE 1 ratified Bishop Rubalcava's sexual abuse of PLAINTIFF because DOE 1 had knowledge through earlier reports of his abuse, yet other DOE 1 leadership intentionally disregarded these warnings. Furthermore, upon information and belief, members of DOE 1 should have reasonably known that Rubalcava was abusing JANE DOE because they witnessed him groping her on DOE 1's property, but Rubalcava allowed Rubalcava to continue to be in charge of PLAINTIFF

66. As a direct and legal result of the sexual abuse by Bishop Rubalcava, JANE DOE experienced physical, emotional and psychological injuries for which she is entitled to monetary damages and other relief.

67. Upon information and belief, DOE 1's action amounted to malicious and oppressive conduct because DOE 1 knowingly harbored a known sexual predator and placed him in positions of authority over minor congregants. Upon Information and belief, DOE 1 was in a position to prevent PLAINTIFF from being sexually abused but instead looked the other way out of convenience and preserving the reputation of DOE 1.

68. The conduct of DOE 1 was wanton, malicious, willful, and/or cruel, as a result, PLAINTIFF is entitled to punitive damages.

## COUNT II

### NEGLIGENCE

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**(Against DOE 1 and DOES 2-500)**

69.    PLAINTIFF incorporates by reference each and every prior allegation as though fully set forth and brought in this cause of action. DEFENDANTS are persons or entities who owed a duty of care to the PLAINTIFF and/or to the minors' parents or had a duty to control the conduct of the perpetrator by way of the special relationship existing between those individuals. Defendants knew or should have known of Rubalcava's misconduct and inappropriate sexual behavior towards PLAINTIFF. As more fully set forth above, Defendants DOE 1 and DOES 2-500, inclusive, were aware and/or on notice – or at a minimum should have been aware – of Bishop Nefi Rubalcava's sexual misconduct with other minors prior to the first occasion on which JANE DOE was abused or even fostered, through the acts of DOE 1.

70.    Upon information and belief, despite receiving reports and other constructive notice of Bishop Nefi Rubalcava's sexually abusing minors, no other leader in the DOE 1 took any action to prevent further abuse.

71.    Accordingly, at the time Bishop Nefi Rubalcava and DOES 2-500, inclusive, performed the acts alleged herein, it was or should have been reasonably foreseeable to DEFENDANTS that by continuously allowing PLAINTIFF to continue to live in the care of Bishop Nefi Rubalcava, DEFENDANTS were placing her in grave risk of being sexually assaulted by Bishop Nefi Rubalcava.

72.    By knowingly subjecting PLAINTIFF to such foreseeable danger, DEFENDANTS were duty-bound to take reasonable steps and implement reasonable safeguards to protect PLAINTIFF and other potential victims from Bishop Nefi Rubalcava. Furthermore, as alleged herein, DEFENDANTS at all times exercised a sufficient degree of control to prevent the acts of assault by Bishop Nefi Rubalcava. However, Defendants DOE 1 and DOES 2-500, inclusive, failed to take any reasonable steps or implement any reasonable safeguards for PLAINTIFF'S protection whatsoever, and continued to allow PLAINTIFF to be assaulted.

73.    Upon information and belief, DOE 1, by and through its agents, had actual and constructive knowledge of Bishop Nefi Rubalcava's propensity to sexually abuse minors, but did nothing to protect minor members of DOE 1 against him.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

74.    As a direct and legal result of the negligence by DEFENDANTS, PLAINTIFF JANE DOE experienced physical, emotional and psychological injuries for which she is entitled to monetary damages and other relief.

## COUNT III

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against DOE 1 and DOES 2-500)

75.    PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

76.    DEFENDANTS are liable for the emotional distress a plaintiff experiences as a result of the breach of a duty of care to the plaintiff where defendants unreasonably endangered the PLAINTIFF' physical safety or caused them to fear for their safety and experience extreme emotional distress. Defendants' actions must be extreme and outrageous.

77.    DEFENDANTS owed a duty of care to PLAINTIFF to protect her from known sexual abusers.

78.    DEFENDANTS unreasonably endangered PLAINTIFF'S physical safety by allowing her to be in direct and frequent contact with a known child sex predator, Bishop Nefi Rubalcava, who DEFENDANTS were protecting.

79.    Allowing a child to be in direct, unsupervised contact with a known child sex abuser is both extreme and outrageous, and DEFENDANTS knew or should have known that PLAINTIFF would have experienced extreme sexual abuse and emotional distress as a result.

80.    As a direct and legal result of DEFENDANTS' actions and misconduct, PLAINTIFF experienced physical, emotional and psychological injuries for which they are entitled to monetary damages and other relief.

81.    DEFENDANTS' actions amounted to malicious and oppressive conduct because DEFENDANTS knowingly harbored a known sexual predator and placed him in direct contact with other minor congregants by placing him as the head of the entire WARD as Bishop and in other leadership positions. DEFENDANTS were in a position to prevent PLAINTIFF from being

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

sexually abused but took actions to facilitate incidences of sexual abuse by Bishop Nefi Rubalcava.

82.    DEFENDANTS' conduct was wanton, malicious, willful, and/or cruel, as a result, PLAINTIFF is entitled to punitive damages.

**COUNT IV**

**NEGLIGENT HIRING SUPERVISION & RETENTION OF AN UNFIT EMPLOYEE**

**(Against DOE 1 and DOES 2 through 500)**

83.    PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

84.    DOE 1, its agents, and employees, including bishops, clergy, and counselors, and DOES 2-500, had the responsibility and mandatory duty to adequately and properly investigate, hire, train, and supervise its agents and employees who would be working with minors and students to protect the minors within the DOE 1 community from harm caused by unfit and dangerous individuals retained as Bishop of WARD.

85.    Upon information and belief, during the time PLAINTIFF was being sexually abused by Bishop Nefi Rubalcava, DOE 1 and DOES 2-500 knew of complaints of serious misconduct made against Rubalcava, yet Defendants, and each of them, failed to properly and adequately investigate those complaints and failed to take appropriate disciplinary action against Bishop Nefi Rubalcava.

86.    Instead, DEFENDANT, and DOES 2-500, ignored the allegations and obvious signs of misconduct.

87.    Upon information and belief, DEFENDANTS knew or should have known that Bishop Nefi Rubalcava engaged in repeated misconduct against young members of the community as the ultimate leader of WARD and as a foster parent.

88.    DEFENDANTS knew or should have known of the numerous occasions on which PLAINTIFF was unlawfully groped by Bishop Nefi Rubalcava on DOE 1 property and at DOE 1 events.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

89.    DEFENDANTS breached their duty to investigate properly and adequately hire, train, and supervise Rubalcava as a member of the Bishopric on DOE 1 premises.

90.    Had DEFENDANTS properly investigated, supervised, trained, and monitored Rubalcava's conduct and actions, they would have discovered that he was unfit to be employed as the lead member of the Bishopric and as a youth leader.

91.    DOE 1 and DOES 2-500, negligently hired, supervised, retained, monitored, and otherwise employed Bishop Nefi Rubalcava and negligently failed to ensure the safety of minor community members in the DOE 1 including PLAINTIFF JANE DOE, who was fondled and groped numerous times on DOE 1 property during Bishop Rubalcava's work hours and while PLAINTIFF was entrusted to DOE 1's custody, care and control.

92.    DOE 1 also negligently failed to adequately implement or enforce any procedures or policies that were aimed at preventing, detecting, or deterring the sexual harassment or abuse of minors by members of the priesthood and by members of the Bishopric, such as Bishop Nefi Rubalcava.

93.    Had DOE 1 and DOES 2-500 performed their duties and responsibilities to monitor, supervise, and/or investigate their Bishops, PLAINTIFF would not have been subject to most if not all of the sexual abuse and other harmful conduct inflicted upon them.

94.    As a direct and legal result of this conduct, PLAINTIFF suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, psychological harm, physical injuries, past and future costs of medical care and treatment, and past and future loss of earnings and earning capacity, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

///

///

////

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays judgment as follows:

105.    Against each Defendant, non-economic damages according to proof;

106.    Against each Defendant, economic damages according to proof;

107.    Against each Defendant, punitive damages according to proof;

108.    For attorney fees, as permitted by law;

109.    For costs of suit herein; and

For such other and further relief as the court may deem fit and proper.

## JURY DEMAND

PLAINTIFF demands a trial by jury on all issues so triable.

Date: January 27, 2025

**ANDREWS THORNTON**

By: _Anne Andrews_

Anne Andrews
Sean T. Higgins
Kimberly DeGonia
Ryan McIntosh
Leilah Rodriguez
ANDREWS & THORNTON
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Emails:
survivor@andrewsthornton.com
aa@andrewsthornton.com
shiggins@andrewsthornton.com
kdegonia@andrewsthornton.com

*Counsel for Plaintiff*

20

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**