Anne Andrews, Esq. (SBN: 103280)
Sean T. Higgins, Esq. (SBN 266888)
Kimberly DeGonia, Esq., (SBN 256989)
Ryan M. McIntosh, Esq. (SBN: 328042)
**ANDREWS & HIGGINS**
4701 Von Karman Ave., Ste 300
Newport Beach, CA, 92620
Tel.: (949) 748-1000
Fax: (949) 315-3540
survivor@andrewshiggins.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE<br><br>               Plaintiff,<br><br>     v.<br><br>THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A Corporation), and DOES 2-500, Inclusive,<br><br>           Defendants. | **CASE NO.: 2:25-cv-00713**<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>1. **Sexual Abuse of a Minor (Against Defendant CHURCH and DOES 2-500)**<br>2. **Negligence (Against Defendant CHURCH and DOES 2-500)**<br>3. **Negligent Infliction of Emotional Distress (Against Defendant CHURCH and DOES 2-500)**<br>4. **Negligent Hiring, Supervision, and Retention of an Unfit Employee (Against Defendant CHURCH and DOES 2-500)**<br><br>**DEMAND FOR JURY TRIAL** |

1.      PLAINTIFF JANE DOE ("PLAINTIFF", "JANE DOE"), by and through her attorneys, Andrews & Higgins, Watts Law Firm, bring this action against Defendants  THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Corporation (hereinafter "CHURCH") and DOES 2-500.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

2.    The CHURCH's decisions at every level are shaped by the protection of its reputation and income, rather than the protection of vulnerable congregants. To ensure the continuity of tithing, financial pledges, and future membership, The CHURCH routinely conceals, minimizes, and disregards reports of abuse. In doing so, it knowingly allows abuse to continue and shields abusers from accountability, all to preserve its institutional image and financial interests. This case is about one such child who was fostered with four of her siblings by the CHURCH's Bishop ("Bishop N.R.") and his wife for the purpose of using PLAINTIFF to satisfy Bishop's prurient and pedophilic interests. For the four years she was fostered by Bishop N.R., PLAINTIFF was subjected to sexual abuse, digital penetration, and groping both above and beneath clothing. Further, PLAINTIFF was forced to regularly watch Bishop N.R.—who would routinely masturbate and urinate in her presence—walk around the house naked while maintaining an erection.

## PRELIMINARY STATEMENT

3.    Upon information and belief, the CHURCH had previously received reports that Bishop N.R. had abused other children. Yet, Bishop N.R. was allowed to remain a prominent member of the CHURCH as the Bishop of the Santa Fe Springs Spanish-Speaking Ward. A ward is a local congregation of CHURCH members. A stake is made up of multiple wards, generally between five to ten wards.

4.    Upon information and belief, the CHURCH disregarded red flags of Bishop N.R.'s sexually abusive behavior, including how often, and how closely, he volunteered to work in proximity with children. Instead, Bishops, stake presidents, home teachers, relief society members, and other leaders followed the CHURCH playbook in turning a blind eye to signs of abuse which could mar the reputation of the CHURCH.

5.    PLAINTIFF was removed from her mother and stepfather's home in 1981 when she was approximately 8 years old and was put into foster care in Norwalk, California. She had been baptized as a member of the CHURCH earlier that year and had been attending services with her mother and stepfather for her entire life. She and her siblings were removed from the

2

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

home because of violent physical abuse and disturbing sexual abuse PLAINTIFF and her siblings experienced at the hands of their Stepfather, a member of the CHURCH.

6.      Specifically, Stepfather sexually abused PLAINTIFF by isolating her in a bedroom, kissing her, rubbing her vagina over her underwear, and holding her hand and using it to rub his penis over his clothing.

7.      When PLAINTIFF was removed from her Stepfather's home, PLAINTIFF and her eight siblings were housed and cared for by Bishop N.R. and his wife, on an emergency basis for a month. While under the complete care and control of Bishop N.R. and his wife, PLAINTIFF confided in wife about the abuse she had endured at the hands of her stepfather. Upon information and belief, CHURCH headquarters in Salt Lake City would have been notified of PLAINTIFF's prior sexual abuse due to membership records, policies, and procedures.

8.      Subsequently, PLAINTIFF and her eight siblings entered the foster care system in Los Angeles County, California, and were separated for several months until Bishop N.R. and his wife entered the scene like white knights to reunify the children. They registered as foster parents and allowed the five oldest siblings to stay with them, including PLAINTIFF. The three youngest siblings were permitted by the court to return to their mother, who had moved back to Mexico after the children had been removed from the home.

9.      While in foster care, PLAINTIFF disclosed to her social worker the forceful and unwanted kissing, groping, and fondling she had suffered at the hands of her stepfather.

10.      Upon information and belief, the CHURCH and Bishop N.R. became aware that PLAINTIFF was sexually abused by her stepfather. While serving as Bishop, Bishop N.R. made a calculated decision based upon this information to become a foster parent to PLAINTIFF, knowing the increased vulnerability of a child who had already endured such trauma. He preyed upon her and took advantage of her innocence, naiveté, and traumatic history to manipulate her when she was under his care and control.

11.      Upon information and belief, the CHURCH was already aware of allegations against Bishop N.R. for sexual abuse, yet Bishop N.R. became a foster parent with the full permission and support of the CHURCH.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

12.     From the time PLAINTIFF was baptized into the CHURCH at 8 years old, she was threatened, harassed, intimidated, sexually abused, masturbated, groped, kissed, fondled, forcefully digitally penetrated, and subjected to constant sexual exposure by Bishop N.R. on a weekly basis for several years. PLAINTIFF was abused in Norwalk, California, by a known serial predator whom the CHURCH appointed as Bishop—the highest ecclesiastical leader in the local congregation. The CHURCH placed and retained him in positions of authority over children despite knowledge, or reckless disregard, of the danger he posed, thereby enabling his access to vulnerable victims.

13.     By the time PLAINTIFF was removed from her mother and stepfather's home and placed in emergency foster care in Norwalk, California, she had been baptized into the CHURCH and was attending the Santa Fe Springs Spanish-Speaking Ward. On numerous occasions, the CHURCH had knowledge—constructive or otherwise—of PLAINTIFF's abuse. The abuse by Bishop N.R. began on the CHURCH property at a the CHURCH activity for children and young adults called "Mutual," a weekly social evening event hosted by the CHURCH for their Young Men and Young Women's groups.

14.     At Mutual, Bishop N.R. pretended to stumble and playfully grab PLAINTIFF, tickled her, and leaned on her pretending to need her help to stay upright. He used this as an opportunity to grope her breasts and buttocks in the presence of other members of the CHURCH, including other leadership. This happened on approximately four to five more occasions at the CHURCH sponsored events before it escalated further at home. Not only did Bishop N.R.'s behavior cause PLAINTIFF shame and discomfort due to the violation of her innocence, she was wrought with guilt because of the negative feelings she developed for Bishop N.R., a revered member of the community.

15.     On or about 1981, PLAINTIFF and her eight siblings were temporarily housed with Bishop N.R. and his wife at their residence located in Norwalk, California, for approximately one month on an emergency basis. During this period, PLAINTIFF confided in the Bishop's wife about the sexual abuse by her stepfather. Based on information and belief, the

4

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Bishop's wife acknowledged the disclosure but did not report it to DCFS or the CHURCH leadership.

16.     Later, Bishop N.R. and his wife registered as foster parents with Los Angeles County DCFS and, ultimately, the Juvenile Court approved placement of five of the oldest siblings, including PLAINTIFF (then age eight), into their home.

17.     In and around that time, PLAINTIFF arrived home from elementary school approximately two hours earlier than her older siblings, who were attending high school at the time. Bishop N.R. would be alone at the house waiting for PLAINTIFF each day she arrived home.

18.     Bishop N.R. took full advantage of this alone time with PLAINTIFF to sexually abuse her. He would strategically wait for her on a couch in front of the hallway to her room and the kitchen. When she walked past him, he would trip her, making her fall on top of him so he could grope her over her clothing. Under the guise of helping PLAINTIFF stand up, he would touch her buttocks, pubic area, and breasts. After doing this for several weeks, he escalated to groping her under her clothes on her buttocks and pubic area as well as above her clothes on her breasts while pretending to have trouble helping her stand up. Nearly every time she came home, he would find a way to touch her inappropriately.

19.     After approximately two months of this pattern, he escalated the abuse routine to reaching beneath her underwear, rubbing her vagina, and digitally penetrating her on at least one occasion.

20.     Bishop N.R. also frequently required PLAINTIFF to sit on the couch next to him and tried to kiss her on multiple occasions while preaching to her about the CHURCH beliefs and stories.

21.     Additionally, Bishop N.R. frequently walked naked with an erection through the home forcing PLAINTIFF to watch him masturbate in the living room. In an effort to avoid Bishop N.R.'s conduct, PLAINTIFF began to race to the kitchen and back to her room anytime she wanted to get a snack or a drink of water.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

22.     Bishop N.R. regularly and intentionally left the bathroom door open and forced PLAINTIFF to watch him urinate as a continued way to oversexualize himself to PLAINTIFF. This happened so frequently and was so traumatizing to PLAINTIFF that she began to urinate in a cup in her own bedroom. This was her way of avoiding having to run into Bishop N.R. in the one bathroom in her home.

23.     Bishop N.R. used his prestigious position and reputation in the CHURCH to intimidate PLAINTIFF from reporting the abuse to anyone. Bishop N.R. made threats to PLAINTIFF, claiming that no one would believe her if she told them, that people would hate her if she disclosed the abuse, and caused her to fear for the continued shelter and safety of herself and the four siblings who lived with Bishop N.R.'s. family.

24.     Upon information and belief, Bishop N.R. disenfranchised PLAINTIFF from other members of the CHURCH by creating rumors that PLAINTIFF was a troubled child and a "black sheep", thereby ruining her credibility in the community and further protecting himself in the event that PLAINTIFF reported the abuse. During this time, the abuse continued to escalate as Bishop N.R began routinely reaching beneath PLAINTIFF's underwear to rub her bare buttocks and pubic area, digitally penetrating her vagina while she stood frozen. This conduct occurred two to three times per week until approximately 1984.

25.     PLAINTIFF's behavior noticeably and drastically changed in response to the ongoing abuse. Before the abuse, PLAINTIFF was a gregarious, highly social child, but after the abuse began, she became shy, reserved, and played primarily by herself. Furthermore, before the abuse, PLAINTIFF was highly social with Bishop N.R. along with the other children who loved him., After the abuse began, however, PLAINTIFF began avoiding him at all costs and remained stoic and fearful in his presence. PLAINTIFF was visibly anxious and scared in Bishop N.R.'s presence, shirking away from his touch in public places. Additionally, PLAINTIFF became afraid and avoidant of all adult males, especially those associated with the CHURCH. Adults and children alike in the Ward recognized and commented on PLAINTIFF's retreat from social activities during this time. Despite its own members recognizing these dramatic changes in demeanor, the CHURCH failed to intervene.

6

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

26.     On at least eight occasions, Bishop N.R. required PLAINTIFF to sit on the couch beside him under the guise of teaching the CHURCH scriptures from the Book of Mormon. These sessions would begin and end with him stating that "he was the bishop and people respected him," which further created an environment of fear and duress. He would move in—as if to kiss her—getting as close as he could without actually touching his lips to hers. He also placed her hand on his erect penis over his clothing. Additionally, he placed his hand on her vagina over her clothing.

27.     Despite the CHURCH's knowledge of public groping at Mutual, visible behavioral changes and disclosure to the Bishop's wife, no CHURCH leader intervened in any way.

28.     Bishop N.R. used his position to intimidate PLAINTIFF from disclosing the sexual abuse, repeatedly threatening that "no one will believe you," "people will hate you," and "your siblings will lose their home" if she disclosed the abuse. He also spread rumors within the Ward that PLAINTIFF was a "troubled child" and "black sheep," further isolating her and protecting himself.

29.     Despite PLAINTIFF regularly begging her mother and others in the CHURCH, including the Bishop's wife, not to leave her alone at the house with Bishop N.R., the abuse continued unabated for approximately four years until June 1985. PLAINTIFF, then age 12, ran away from Bishop N.R.'s home and followed her mother to a Greyhound bus stop in Los Angeles, convincing her to take her to Mexico.

30.     The CHURCH never disciplined Bishop N.R., removed his temple recommend, or restricted his access to children. He remained Bishop until 1987 and continued fostering children with the CHURCH's approval and support. JANE DOE has never recovered from the abuse she experienced as a young child.

## JURISDICTION, VENUE, AND STATUTE OF LIMITATIONS

31.     This Court properly has diversity jurisdiction to hear civil claims where complete diversity between PLAINTIFF and defendant exists and the amount in controversy exceeds $75,000, pursuant to 28 U.S.C. § 1332(a). DEFENDANT CHURCH and JANE DOE are

7

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

domiciled in different states and the amount in controversy is sufficient. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District, and Defendants are subject to personal jurisdiction in this District.

32.     State law causes of action I-IV are timely brought pursuant to California Code of Civil Procedure § 340.1, which require PLAINTIFF to bring an action for childhood sexual assault within 5 years of the date they discovered or reasonably should have discovered that their psychological injury or illness was caused by the sexual assault. Here, PLAINTIFF discovered her injuries were related to the sexual assault in December 2020, when she first saw an advertisement on social media talking about the effects of sexual abuse in church communities.

## DEFENDANT PARTIES

**I.**     THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

30.     THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS  (hereinafter the "CHURCH") is a corporation duly organized and operating pursuant to the laws of the State of Utah, with its principal place of business at 50 East North Temple, Floor 20, Salt Lake City, State of Utah 84150. However, the CHURCH operates meeting houses, congregations, and temples (wards, stakes and areas) within the state of California. Indeed, this case centers around one such ward, the Santa Fe Springs Spanish Ward in Santa Fe Springs, California. This ward has since been absorbed into other wards within the Cerritos California Stake.  The CHURCH is registered to do business in California. The presiding bishop of the Santa Fe Springs Spanish Ward served at the pleasure of and subject to the direct and absolute control of the CHURCH. In addition, the CHURCH collects tithes, accepts donations, invests money, and covers up childhood sexual abuse in the state of California. Specifically, this Court has specific personal jurisdiction over the CHURCH arising out of the facts alleged herein: the sexual abuse. As alleged herein, by retaining and obtaining additional tithes, donations and profits from congregants in California as a result of the coverup of PLAINTIFF' abuse, the CHURCH purposefully availed itself of the privilege of conducting activities within California, thus

8

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

invoking the benefits and protection of its laws. This case, and PLAINTIFF'S injuries alleged herein, directly arise out of the CHURCH's activities that took place in California.

31.    At all times relevant to the allegations listed herein, PLAINTIFF was a member of the Santa Fe Springs Spanish-Speaking Ward, which has since been absorbed into other wards in the Cerritos Stake. The Santa Fe Springs Spanish-Speaking Ward ("WARD") was wholly owned and operated by its parent, CHURCH, based in Salt Lake City, Utah.

## II.    DOE DEFENDANTS 2-500

32.    The true names or capacities, whether individual, corporate, or otherwise, of Defendants DOES 2 through 500, inclusive, are unknown to PLAINTIFF who are therefore ignorant of the true names and sue said Defendants by such fictitious names. PLAINTIFF believe and allege that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to PLAINTIFF as alleged herein. The true names, whether corporate, individual or otherwise, of Defendants 2 through 500, inclusive, are presently unknown to PLAINTIFF, which therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained.

33.    At all times hereinafter alleged, "DEFENDANTS" or "All DEFENDANTS" include all herein named Defendants as well as Defendants DOES 2 through 500, inclusive.

34.    At all times herein alleged, each of the DEFENDANTS was the agent, servant, partner, aider and abettor, co-conspirator and joint venturer of each of the remaining DEFENDANTS herein and was at all times operating and acting within the course, purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other DEFENDANTS, knowing that their conduct constituted a breach of duty owed to PLAINTIFF and unlawful harm to PLAINTIFF.

<u>**PLAINTIFF**</u>

9

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

35.     JANE DOE was at all times relevant to the tortious conduct herein mentioned domiciled in the County of Los Angeles, State of California. JANE DOE attended the Santa Fe Springs Spanish Ward in the Cerritos California Stake at all times relevant to the tortious conduct herein mentioned. At the time of filing this complaint, JANE DOE is domiciled in Las Vegas, Nevada.

**36.**     This is an action for childhood sexual abuse brought pursuant to Code of Civil Procedure ("CCP") § 340.1, subdivision (a)-(d) and any other applicable statute. The true name of Defendant CHURCH is known to PLAINTIFF, but they were named as a DOE Defendant Pursuant to Code of Civil Procedure §340.1. At the time of filing this complaint, PLAINTIFF is above the age of 40.

## FACTUAL BACKGROUND

37.     The case is not about religious or doctrinal beliefs in any way. This case is about an organization that retained and protected a known predator and permitted its youth members to be repeatedly sexually abused.

38.     In 2017, a lengthy expose compiled by a child abuse health researcher was released online. The 300-page document details hundreds of instances of sex abuse within the CHURCH taken primarily from public court filings. The research is an eye-opening look into the pervasiveness of childhood sexual abuse in the CHURCH and their inadequacy in responding to it. A common theme emerges of ward bishops and leaders being given information of child sexual abuse in the ward, information which is then passed along to the CHURCH Nothing is done. No one is told. And the abuse continues.

39.     In the rare circumstances a report is made to the authorities, the CHURCH still diminishes, denies, and conceals evidence of the abuse and their knowledge of it from the CHURCH members, authorities, and the public at large.

40.     The CHURCH maintains a pattern and practice of concealing abuse from the authorities, and signals that its members should conceal and/or fail to report abuse so as to keep "the CHURCH from being inappropriately implicated in legal matters." See President Russell M. Nelson Letter (August 4, 2020). Through this policy of concealment, the CHURCH ratifies

10

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

abusive conduct, perpetuating a culture of concealment and encouraging a lack of cooperation among the CHURCH members with law enforcement. This case is no different.

41. The CHURCH is well known for its meticulous record keeping. The CHURCH maintains an archive of records at Granite Mountain Records Vault located in the foothills surrounding the Salt Lake Valley in Utah. These records detail important circumstances surrounding individual members. Reports are created and maintained at individual wards that detail membership attendance, genealogy of members, addresses of members, reports of abuse, and reports regarding disciplinary proceedings. These records are then sent from the individual wards to the record archives that are maintained in the greater Salt Lake City area in Utah. The records and custom and practice of maintaining records require an individual record for each member. The disciplinary records are comprehensive and detailed, per the practices of the CHURCH.

42. The CHURCH's written policies shed light on their general priorities. According to the CHURCH's General Handbook, "The purposes of the CHURCH discipline are (1) to save the souls of transgressors, (2) to protect the innocent, and (3) to safeguard the purity, integrity, and good name of the Church. These purposes are accomplished through private counsel and caution, informal probation, formal probation, disfellowship, and excommunication." See pgs. 93-95. The Stake Presidents and Bishops Handbook states as follows: "[i]n instances of abuse, the first responsibility of the Church is to assist those who have been abused, and to protect those who may be vulnerable to future abuse."

43. More specifically, the CHURCH notes in its administrative handbook that the second purpose of Church discipline is to protect the innocent. Yet, perpetrators go undisciplined until discipline is made necessary by an external force. Disclosure of the identity of others who participated in a transgression may be required when it is necessary to restore or protect persons who have been or may be seriously injured as a result of the transgression. The CHURCH's position is that abuse cannot be tolerated in any form. Abusers should not be given Church callings, which are positions of service that members are appointed to through revelation and the Spirit. Additionally, abusers may not have a temple recommend, which signifies that a member

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

can enter the temple. Even if a person who abused a child sexually or physically receives Church discipline and is later restored to full fellowship or readmitted by baptism, leaders should not call the person to any position working with children or youth unless the First Presidency authorizes removal of the annotation on the person's membership record. The First Presidency is the highest governing body in the CHURCH and consists of a prophet and two prophet counselors.

44.    The CHURCH's written policies may look congruent with reasonable care on their face. However, a quick look reveals that they are sorely lacking. Nevertheless, the policies they put into practice diverge significantly from even those written in its Handbook.

45.    The CHURCH maintains a national Helpline that purports to assist victims in reporting their sexual assaults. However, The CHURCH implements the Helpline not for the protection and counseling of sexual abuse victims, as professed in the CHURCH literature, but for Kirton McConkie attorneys to snuff out complaints and protect the CHURCH from potentially costly lawsuits and jury verdicts. This is consistent with the instructions set forth in President Russell M. Nelson Letter, dated August 4, 2020, encouraging congregants to avoid cooperating with authorities asking for information on abuse.

46.    In conjunction with the doctrine of helping victims, Utah's Supreme Court has characterized the Helpline used by the CHURCH as "a 1-800 number that bishops and other the CHURCH clergy can call when they become aware of possible abuse. The Help Line is available 24 hours a day, 365 days a year and is staffed by legal and counseling professionals who 'provide guidance to the bishop on how to protect the [victim] from further abuse, and how to deal with the complex emotional, psychological, and legal issues that must be addressed in order to protect the victim.'" MacGregor v. Walker, 2014 UT 2 ¶2,322 P.3d 706, 707 (2014) [internal citation omitted in original].

47.    In reality, the CHURCH primarily staffs the Helpline with attorneys of Kirton McConkie, one of the largest law firms in the State of Utah. Rather than notifying law enforcement or other government authorities when Bishops and other clergy members call the Helpline regarding sexual abuse within the CHURCH Helpline operators transfer these calls to

12

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

the Kirton McConkie attorneys, who advise the caller not to report the abuse incident to law enforcement, misrepresenting clergy-penitent privilege laws as their reasoning.

48.    In another sexual abuse-related civil lawsuit against the Mormon the CHURCH and its agents, a Kirton McConkie attorney "acknowledged during a pretrial deposition that the firm uses information gleaned from helpline calls to identify cases that pose a high financial risk to the Mormon Church" See The Mormon Church Has Been Accused of Using a Victim's Hotline to Hide Claims of Sexual Abuse (https://www.vice.com/en/article/duty-to-report-the-mormon-church-has-been-accused-of-using-a-victims-hotline-to-hide-sexual-abuse-claims/).

49.    The Sins of Brother Curtis recounts the horrific details of the CHURCH's systemic failure to address known predators in its leadership. Lisa Davis, The Sins of Brother Curtis (2011). Brother Curtis was an elder in the CHURCH, a position attained by most men after a worthiness interview by the stake president -the leader of a group of local congregations. Despite spending numerous years in prison for crimes he committed prior to joining the CHURCH, he was deemed worthy to hold the position of an elder. Countless the CHURCH leaders learned of Brother Curtis' tendencies to molest children but failed to report him or inform their congregants. Brother Curtis sexually abused at least twenty (20) minors over a 14-year span. Despite leaders within the CHURCH knowing of Brother Curtis' proclivity for sexually abusing minors, the CHURCH, as part of a national conspiracy spanning decades, moved Brother Curtis from a ward in Oregon to Wyoming back to Oregon then to Michigan and finally back to Oregon. At one point, Brother Curtis had been excommunicated but was permitted to be rebaptized into the CHURCH where he continued to sexually abuse minors.

50.    Upon information and belief, the CHURCH was aware that Bishop N.R. abused other children and yet he was allowed to continue serving as WARD's bishop and was praised for being PLAINTIFF's foster parent. Upon information and belief, the CHURCH required adults who knew of Bishop N.R.'s unlawful, perverted sexual actions, to remain quiet about it.

51.    Bishop N.R. was never disciplined for his sexual deviance and pedophilic predatory behavior. JANE DOE has never recovered from the abuse she experienced as a young child.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

*The CHURCH Failed to Protect PLAINTIFF and Enabled the Horrendous Abuse to Continue Beyond Bishop N.R.'s First Reported Victims*

52. Upon information and belief, Bishop N.R. sexually abused other children in the CHURCH and the CHURCH was aware of this.

53. Bishop N.R. was an esteemed and valuable member of the CHURCH community, holding leadership positions with youth and in the Bishopric, including as Bishop. the CHURCH proceeded to suppress the knowledge—both actual and constructive— in order to preserve its own reputation and that of Bishop N.R., turning a blind eye and a deaf ear to the actual and constructive warnings it received throughout PLAINTIFF's abuse.

54. The CHURCH knew that public disclosure of Bishop N.R.'s child sexual abuse would devastate its reputation and financial stability. Bishop N.R. was not an obscure member— he was handpicked by the Church's patriarchs, who claimed divine "discernment" in his appointment. Bishop N.R. willingly accepted this position of responsibility. Had it been revealed that the supposed revelation from God was, in fact, the selection of a child abuser, the CHURCH would have faced an exodus of members, a collapse in donations, and a loss of the unpaid labor on which the institution depends. To protect itself, the CHURCH chose concealment over truth. Its professed mission to "protect victims" is a façade; in practice, the CHURCH protects its money, power, and public image at all costs. This case exemplifies moral bankruptcy. the CHURCH could—and should—have stopped Bishop N.R. from having access to children, including his foster daughter, when the first reports of abuse surfaced. Instead, it allowed him to continue in leadership. Worse still, the CHURCH knew that PLAINTIFF had already been victimized by her stepfather and that she was placed in the care of a Church leader rather than family—facts that should have heightened the CHURCH's duty to safeguard her. Yet it did nothing.

55. Upon information and belief, by wrongfully failing to make a report to law enforcement upon learning of Bishop N.R.'s victims, the CHURCH prevented law enforcement from investigating sooner, which would have produced evidence of Bishop N.R.'s calculated and perverted sexual abuse of children.

14

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

56.     Instead, the CHURCH allowed Bishop N.R. to continue completely unhindered and even protected his predatory conduct. the CHURCH, its agents, and employees, including bishops, counselors, or personnel mentioned herein, DOES 2 - 500, and each of them, acted to protect the heinous and unforgivable acts of its member, Bishop N.R., and in such action taken against PLAINTIFF'S innocence and vulnerabilities, were careless, reckless, negligent, and consciously disregarding a minor's rights.

## PUNITIVE DAMAGES ALLEGATIONS

57.     PLAINTIFF repeats and re-alleges the allegations set forth in the above paragraphs 1-54 as though fully set forth herein.

58.     At all times herein, DEFENDANTS knew or should have known of Bishop N.R.'s history of child sex abuse. the CHURCH acted with reckless indifference for every child in the WARD when they failed to report out, warn, or take any affirmative steps to protect children from Bishop N.R. As a result of the CHURCH's deliberate inaction, innumerable children were endangered by Bishop N.R.

59.     Upon information and belief, despite prior knowledge of Bishop N.R.'s predatory behavior, the CHURCH maintained Bishop N.R. as a member in good standing with the corporation, allowing him to have access to more potential victims as a leader in the CHURCH and as a foster parent to other children. As alleged herein, each of the DEFENDANTS and its agents played a role in enabling Bishop N.R. to abuse PLAINTIFF.

60.     This case is not about doctrine, but secular negligence in protecting a known prior victim from a known prior abuser.

61.     the CHURCH knew or should have known of prior victims, yet allowed N.R. to remain Bishop.

62.     Public groping at Mutual (¶¶ 30–31) gave constructive notice to Ward leaders, imputed to the CHURCH. Ratification of child rape is a secular act, not a religious one. Such conduct is willful, wanton, and reckless, justifying an award of punitive damages in an amount to be proven at trial.

## COUNT I

15

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**SEXUAL ABUSE OF A MINOR**

**(Against Defendants CHURCH and DOES 2-500)**

63.    PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

64.    While PLAINTIFF was a member of the CHURCH's community and reliant upon the CHURCH, Bishop N.R. used his position of authority in the CHURCH as the Bishop of the Santa Fe Springs Spanish Ward and as JANE DOE's foster father to silence and maintain control over JANE DOE. This tactic included concealing his predatory behavior by molesting JANE DOE while ostensibly providing religious instruction. Bishop N.R. was so bold that he molested JANE DOE in the presence of others at the ward on multiple occasions. This supported his claims to JANE DOE that no one would believe he was harming her because of how beloved and respected he was by the Santa Fe Springs Spanish Ward.

65.    Bishop N.R. did this to sadistically, violently, and incestuously sexually abuse and control JANE DOE for at least 4 years of her childhood. This included molestation, groping, fondling, masturbation, digital penetration, and other egregious misconduct with PLAINTIFF. PLAINTIFF did not consent to the acts, nor could she have  given her young age at the time of the abuse.

66.    Upon information and belief, the CHURCH ratified Bishop N.R.'s sexual abuse of PLAINTIFF because the CHURCH had knowledge through earlier reports of his abuse, yet other the CHURCH leadership intentionally disregarded these warnings. Furthermore, upon information and belief, members of the CHURCH should have reasonably known that Bishop N.R. was abusing JANE DOE because they witnessed him groping her on the CHURCH's property, but Bishop N.R. allowed Bishop N.R. to continue to be in charge of PLAINTIFF.

67.    As a direct and legal result of the sexual abuse by Bishop N.R., JANE DOE experienced physical, emotional, and psychological injuries for which she is entitled to monetary damages and other relief.

68.    The conduct of the CHURCH was wanton, malicious, willful, and/or cruel. As a result, PLAINTIFF is entitled to punitive damages.

16

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

69.     PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action. While PLAINTIFF was a member of the CHURCH's community and reliant upon the CHURCH, Bishop N.R. used his position of authority in the CHURCH as the Bishop of the Santa Fe Springs Spanish Ward to silence and maintain control over JANE DOE. This tactic included concealing his predatory behavior by molesting JANE DOE while ostensibly providing religious instruction. Bishop N.R. was so bold that he also molested JANE DOE in the presence of others at the ward on multiple occasions. This supported his claims to JANE DOE that no one would believe he was harming her because of how beloved and respected he is by the Santa Fe Springs Spanish Ward. Bishop N.R. did this to sadistically, violently, and even incestuously sexually abuse and control JANE DOE for at least 4 years of her childhood. This included molestation, groping, fondling, masturbation, digital penetration, and other harmful misconduct with PLAINTIFF. PLAINTIFF did not consent to the acts, nor could PLAINTIFF have consented to the acts given her young age at the time of the abuse.

70.     As a direct and legal result of the sexual abuse by Bishop N.R., JANE DOE experienced physical, emotional and psychological injuries for which she is entitled to monetary damages and other relief. Upon information and belief, the CHURCH's action amounted to malicious and oppressive conduct because the CHURCH knowingly harbored a known sexual predator and placed him in positions of authority over minor congregants. Upon information and belief, the CHURCH was in a position to prevent PLAINTIFF from being sexually abused but instead looked the other way out of convenience and preserving the reputation of the CHURCH. The conduct of the CHURCH was wanton, malicious, willful, and/or cruel, as a result, PLAINTIFF is entitled to punitive damages.

71.     Bishop N.R. acted within the scope of his duties as Bishop and began abusing JANE DOE at Mutual. Bishop N.R. continued to preach on behalf of the CHURCH's beliefs while openly abusing PLAINTIFF without any action or investigation by the CHURCH. (¶¶ 30–34).

## COUNT II

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## NEGLIGENCE

### (Against Defendants CHURCH and DOES 2-500)

72.    PLAINTIFF incorporates by reference each and every prior allegation as though fully set forth and brought in this cause of action. DEFENDANTS are persons or entities who owed a duty of care to the PLAINTIFF and/or to the minors' parents or had a duty to control the conduct of the perpetrator by way of the special relationship existing between those individuals. DEFENDANTS knew or should have known of Bishop N.R.'s misconduct and inappropriate sexual behavior towards PLAINTIFF. As more fully set forth above, DEFENDANTS the CHURCH and DOES 2-500, inclusive, were aware and/or on notice—or at a minimum should have been aware—of Bishop N.R.'s sexual misconduct with other minors prior to the first occasion on which JANE DOE was abused or even fostered, through the acts of the CHURCH.

73.    As more fully set forth above, DEFENDANTS the CHURCH and DOES 2-500, inclusive, were aware and/or on notice—or at a minimum should have been aware—of Bishop N.R.'s sexual misconduct with other minors prior to the first occasion on which JANE DOE was abused or even fostered, through the acts of the CHURCH. Upon information and belief, despite receiving reports and other constructive notice of Bishop N.R.'s sexually abusing minors, no leader in the CHURCH took any action to prevent further abuse.

74.    Accordingly, at the time Bishop N.R. and DOES 2–500, inclusive, engaged in the conduct alleged herein, it was or should have been reasonably foreseeable to DEFENDANTS that turning a blind eye to the abuse and allowing Bishop N.R. to retain his position as Bishop placed PLAINTIFF at a grave and unacceptable risk of continued sexual assault by him.

75.    By knowingly subjecting PLAINTIFF to such foreseeable danger, DEFENDANTS were duty-bound to take reasonable steps and implement reasonable safeguards to protect PLAINTIFF and other potential victims from Bishop N.R. Furthermore, as alleged herein, DEFENDANTS at all times exercised a sufficient degree of control to prevent the acts of assault by Bishop N.R. However, DEFENDANTS the CHURCH and DOES 2-500, inclusive, failed to take any reasonable steps or implement any reasonable safeguards for PLAINTIFF'S protection whatsoever, and continued to allow PLAINTIFF to be assaulted.

18

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

76.     Upon information and belief, the CHURCH, by and through its agents, had actual and constructive knowledge of Bishop N.R.'s propensity to sexually abuse minors, but did nothing to protect minor members of the CHURCH against him. As a direct and legal result of the negligence by DEFENDANTS, PLAINTIFF JANE DOE experienced physical, emotional and psychological injuries for which she is entitled to monetary damages and other relief.

<u>**COUNT III**</u>

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(Against Defendants CHURCH and DOES 2-500)**

77.     PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

78.     DEFENDANTS are liable for the emotional distress a plaintiff experiences as a result of the breach of a duty of care to the plaintiff where defendants unreasonably endangered the plaintiff's physical safety or caused them to fear for their safety and experience extreme emotional distress. DEFENDANTS' actions must be extreme and outrageous.

79.     DEFENDANTS owed a duty of care to PLAINTIFF to protect her from known sexual abusers.

80.     DEFENDANTS unreasonably endangered PLAINTIFF'S physical safety by allowing her to be in direct and frequent contact with a known child sex predator on the CHURCH's property, Bishop N.R., who DEFENDANTS were protecting.

81.     Allowing a child to be in direct, unsupervised contact with a known child sex abuser is both extreme and outrageous, and DEFENDANTS knew or should have known that PLAINTIFF would have experienced extreme sexual abuse and emotional distress as a result.

82.     As a direct and legal result of DEFENDANTS' actions and misconduct, PLAINTIFF experienced physical, emotional and psychological injuries for which they are entitled to monetary damages and other relief.

83.     DEFENDANTS' actions amounted to malicious and oppressive conduct because DEFENDANTS knowingly harbored a known sexual predator and placed him in direct contact with PLAINTIFF and other minor congregants by placing him as the head of the entire WARD

19

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

as Bishop and in other leadership positions. DEFENDANTS were in a position to prevent PLAINTIFF from being sexually abused but took actions to facilitate incidences of sexual abuse by Bishop N.R.

84.     DEFENDANTS' conduct was wanton, malicious, willful, and/or cruel, as a result, PLAINTIFF is entitled to punitive damages.

## COUNT IV

**NEGLIGENT HIRING SUPERVISION & RETENTION OF AN UNFIT EMPLOYEE**

**(Against Defendants CHURCH and DOES 2 through 500)**

85.     PLAINTIFF incorporates by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

86.     the CHURCH, its agents, and employees, including bishops, clergy, and counselors, and DOES 2-500, had the responsibility and mandatory duty to adequately and properly investigate, hire, train, and supervise its agents and employees who would be working with minors and students to protect the minors within the CHURCH community from harm caused by unfit and dangerous individuals retained as Bishop of WARD.

87.     Upon information and belief, during the time PLAINTIFF was being sexually abused by Bishop N.R., the CHURCH and DOES 2-500 knew of complaints of serious misconduct made against Bishop N.R., yet DEFENDANTS, and each of them, failed to properly and adequately investigate those complaints and failed to take appropriate disciplinary action against Bishop N.R.

88.     Instead, the CHURCH, and DOES 2-500, ignored the allegations and obvious signs of misconduct.

89.     Upon information and belief, DEFENDANTS knew or should have known that Bishop N.R. engaged in repeated misconduct against young members of the community as the ultimate leader of WARD.

90.     DEFENDANTS knew or should have known of the numerous occasions on which PLAINTIFF was unlawfully groped by Bishop N.R. on the CHURCH property and at the CHURCH events.

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

91.     DEFENDANTS breached their duty to investigate properly and adequately hire, train, and supervise Bishop N.R. as a member of the Bishopric on the CHURCH premises.

92.     Had DEFENDANTS properly investigated, supervised, trained, and monitored Bishop N.R.'s conduct and actions, they would have discovered that he was unfit to be employed as the lead member of the Bishopric and as a youth leader.

93.     the CHURCH and DOES 2-500, negligently hired, supervised, retained, monitored, and otherwise employed Bishop N.R. and negligently failed to ensure the safety of minor community members in the CHURCH including PLAINTIFF, who was fondled and groped numerous times on CHURCH property during Bishop N.R.'s work hours and while PLAINTIFF was entrusted to the CHURCH's custody, care and control.

94.     the CHURCH also negligently failed to adequately implement or enforce any procedures or policies that were aimed at preventing, detecting, or deterring the sexual harassment or abuse of minors by members of the priesthood and by members of the Bishopric, such as Bishop N.R.

95.     Had the CHURCH and DOES 2-500 performed their duties and responsibilities to monitor, supervise, and/or investigate their Bishops, PLAINTIFF would not have been subjected to most, if not all, of the sexual abuse and other harmful conduct inflicted upon PLAINTIFF. Bishop N.R.'s retention by the CHURCH after publicly groping PLAINTIFF at Mutual led to foreseeable and ongoing sexual abuse.

96.     As a direct and legal result of this conduct, PLAINTIFF suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, psychological harm, physical injuries, past and future costs of medical care and treatment, and past and future loss of earnings and earning capacity, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF prays judgment as follows:

97.     Against each Defendant, non-economic damages according to proof;

98.     Against each Defendant, economic damages according to proof;

21

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

99.     Against each Defendant, punitive damages according to proof;

100.    For attorney fees, as permitted by law;

101.    For costs of suit herein; and

102.    For such other and further relief as the court may deem fit and proper.

**JURY DEMAND**

PLAINTIFF demands a trial by jury on all issues so triable.

///

///

22

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Date: February 24, 2026

**ANDREWS & HIGGINS**

By: *Anne Andrews*

Anne Andrews
Sean T. Higgins
Kimberly DeGonia
Ryan McIntosh
**ANDREWS & HIGGINS**
4701 Von Karman Ave., Suite 300
Newport Beach, CA 92660
Emails:
survivor@andrewshiggins.com
aa@andrewshiggins.com
shiggins@andrewshiggins.com
kdegonia@andrewshiggins.com
rmcintosh@andrewshiggins.com

***Attorneys for Plaintiff***

23

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF ORANGE

*Jane Doe v. DOE 1, et al.*

*2:25-cv-00713*

I am employed in the County of Orange, State of California. I am over the age of l8 and not a party to the within action. My business address is 4701 Von Karman Ave., Suite 300, Newport Beach, California 92660.

On February 24, 2026, I served the foregoing document described as: **PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** by placing ____ the original  XX  true copies thereof  sent as follows:

| | |
|---|---|
| Rick Richmond, Esq. **LARSON LLP** | 555 South Flower Street, 30th Floor Los Angeles, California 90071 rrichmond@larsonllp.com acalderon@larsonllp.com msalazar@larsonllp.com ddavalos@larsonllp.com agooneratne@larsonllp.com tbryant@larsonllp.com **Counsel for Defendant DOE 1** |

 XX  **BY E-MAIL/ELECTRONIC TRANSMISSION**: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail address listed in on the service list. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

 XX  **FEDERAL**: I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on February 24, 2026, at Newport Beach, California.

*Beth A. Spillman*
_____
Beth A. Spillman

PROOF OF SERVICE